**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00042 (ABJ)** |
| **v.** | : | |
| | : | |
| **ANDREW WRIGLEY,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Andrew Wrigley to a two-month term of home detention as part of a 36 month term of probation, 60 hours of community service, and $500 in restitution.

### I.      Introduction

Wrigley participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the Congressional certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars of property damage.

Andrew Wrigley, one of the first rioters charged, pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, and Picketing in a Capitol Building. A term of home detention as part of a sentence of probation is appropriate in this case because (1) Wrigley heard concussive sounds, smelled tear gas and saw officers in riot gear; (2) he entered the Capitol through the Upper West Terrace doors breached by rioters only *four* (4) minutes earlier; (3) he heard a fire alarm going off in the building and heard rioters leaving as he entered say "they don't

want us here"; and (4) proudly posted about the riot on social media after the event on his Facebook account, which became inaccessible after January 8, 2021.

The Court must also consider that Wrigley's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement officers, breach the Capitol building, and disrupt for several hours the Electoral College certification proceedings. But for his actions alongside so many others, the riot likely would have failed. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, Wrigley's participation in a riot that actually succeeded in halting the Congressional certification combined with Wrigley's bragging, celebration, and endorsement of the events on that day, militates against a sentence of straight probation and in favor of a term of home confinement.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 29 (Statement of Offense), at 1-3. As this Court knows, a riot cannot occur without rioters, and each rioter's actions contributed, directly and indirectly, to the violence and destruction of that day.

### *Andrew Wrigley's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Andrew Wrigley traveled to Washington, D.C., from his home in Jim Thorpe, Pennsylvania to attend the "Stop the Steal" rally, and to protest what he believed was a fraudulent election. He came on a chartered bus with other individuals and brought along his 1776

flag. After the rally, he walked to the Capitol with other rioters. Upon walking up to the Capitol, the scene below shows a large crowd with smoke or other substances in the air:



Rioters outside the Upper West Terrace doors were shoulder to shoulder, pushing to enter at the time Wrigley entered, as shown in the photographs below[1]:

---

[1] https://projects.propublica.org/parler-capitol-videos/



Wrigley entered the building with a mob of rioters through the Upper West Terrace doors at approximately 2:38 p.m. - approximately 4 minutes after initial breach of that entrance—



While standing just inside the building, Wrigley took a "selfie" photograph, as shown in the screen shot of the security camera video show below. The selfie appears below the screen shot.





As shown above, a few officers were by the inner door as rioters came into the building at the time Wrigley entered, and as Wrigley entered, he saw other rioters leaving and heard them say something to the effect of "they don't want us here" and "we need to leave." Wrigley left the Capitol after standing inside the outer door for approximately one (1) minute after taking the selfie, but not before moving well within any restricted area.



Wrigley posted the selfie shown above on his Facebook page to show everyone he had been at the Capitol. He also posted the below photograph where he was standing in a group as he held the 1776 flag aloft:



Wrigley also posted photographs of the rioters outside the Capitol with the hashtag *#stopthesteal* and an admission he "went inside the capitol building and got tear gassed."





These photographs could be accessed by the public on January 7 and 8, 2021. His Facebook page was no longer accessible later on January 8, 2021. *See* ECF 1-1, Statement of Facts, at 2.

Wrigley spoke with the FBI as a condition of his plea agreement. He admitted going to the Stop the Steal rally because he had concerns about the legitimacy of the 2020 Presidential election and thought the rally would be fun and festive. He also told the agent he took both the 1776 flag and a spring from a door to use as a weapon in case of a counter protest but left the latter on the bus. He admitted getting a whiff of tear gas and seeing riot police in the distance, but nonetheless

went into the Capitol where he said he heard a fire alarm going off in the building. Wrigley also admitted he took a selfie inside the building to show everyone that he had been there.

*The Charges and Plea Agreement*

On January 11, 2021, Wrigley was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G). On January 15, 2021, he was arrested in Pennsylvania. On January 21, 2021, Wrigley was charged by a four-count Information with 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G). On September 8, 2021, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. By plea agreement, Wrigley agreed to pay $500 in restitution to the Architect of the Capitol.

## III.     Statutory Penalties

Wrigley now faces sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Wrigley faces up to six months of imprisonment and a fine of up to $5,000. Wrigley must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote

respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below the Section 3553(a) factors weigh in favor of home detention as part of a term of probation, along with community service.

A. **The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should consider that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Wrigley specifically heard a blaring fire alarm when he entered. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials, and smelled chemical irritants in the air, as did Wrigley, who told the FBI he smelled a whiff of tear gas. No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or encouraged violence; (3) whether the defendant engaged in any acts of destruction or encouraged violence; (4) the

defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

Wrigley took pictures of the crowds outside the Capitol on January 6, 2021 and posted some online, stating he had gone inside and had been tear gassed. One picture he posted showed him proudly holding up a 1776 flag[2]. He told the FBI he heard a boom, that he smelled a whiff of tear gas, and saw officers in riot gear. Yet he chose to enter Capitol only four (4) minutes after the Upper West Terrace doors had been breached in order to take a picture to prove to people he was actually at the riot. He stated to FBI that he heard a fire alarm blaring inside and once inside something felt "wrong". In fact, he heard rioters who were leaving as he entered say that "they don't want us here" and he saw officers at the inner doorway. Nevertheless, he entered still carrying the 1776 flag and then took photographs before leaving, so as to prove his presence. He then posted the selfie and photographs taken outside the Capitol on Facebook for the world to see. While it is commendable that the defendant did not enter further, it is shocking, if not disingenuous to suggest that upon entering the building, *that* was when he felt something was wrong, as if the surging crowd, the blaring alarms, the smell of chemical irritants, and the dispersal of law enforcement were not sufficient signs of the danger that lay ahead.

---

[2] "References to the year 1776 and the American Revolution have grown substantially among the far-right as … conspiracy theorists have hinted at the possibility of a revolution." *See* https://www.washingtonpost.com/nation/interactive/2021/far-right-symbols-capitol-riot/

Accordingly, the nature and the circumstances of this offense establish the need for a restraint on Wrigley's liberty as a consequence for his actions in this matter.

### B.  The History and Characteristics of Wrigley

Wrigley has no criminal history. ECF 33 PSR, ¶¶ 22-24. He is trained and educated as an artist but earns his income from rental property. Id. at ¶¶ 57-58, 62-63. According to the PSR, he also has skills in basic plumbing, carpentry and electrical work. *Id.* at ¶ 61. He is presently enrolled in community college to obtain certification in HVAC work. *Id.* at ¶ 59. He has been compliant with his conditions of pre-trial release. *Id.* at ¶ 8.

This factor favors Wrigley but supports a condition of probation and the need for community service, where he can put his skills to give back to the community.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[3] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

---

[3] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2) (B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. The violence at the Capitol on January 6 was intended by many to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id*. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on

14

January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). This Court should convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have adverse consequences. There is possibly no greater factor that this Court must consider. This country will be forever stained by that day.

*Specific Deterrence*

Wrigley went to Washington D.C. to protest the legitimacy of the 2020 Presidential election. He went inside the Capitol despite hearing a boom, smelling tear gas, seeing officers in riot gear. He heard rioters leaving as he entered say that they were not wanted there. He carried with him a 1776 flag – one used to indicate rebellion against a ruling government. He heard a fire alarm in the building and yet stayed long enough to take selfies to post online to prove he went to the Capitol on January 6, 20201. He later posted photographs of the mobs outside the Capitol and boasted he was there and got tear gassed. By January 8, 2021, however, Wrigley's Facebook was no longer accessible. To specifically deter Wrigley from engaging in future, riotous behavior, he should understand the consequences of his conduct, and how his individual conduct affected the country.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspire to corruptly interfere with Congress.[4] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum

---

[4] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[5] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

While the number of sentenced defendants is low, the government and the sentencing courts have already begun to make meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but

---

[5] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Wrigley has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559(a)(7). Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long they remained inside, the nature of any statements they made (on social media or otherwise), whether they destroyed evidence of their participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Assessing disparities requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing

regime than in the later." *Id.; see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, this Court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences previously handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the misdemeanor Capitol breach cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors, such as a defendant's

efforts to prevent assaults on police, prompt acceptance of responsibility, and expressions of genuine remorse.

A comparison with sentences imposed in other misdemeanor cases with similar facts is informative. In *United States v Andrew Bennett*, 21-CR-227 (JEB) Bennett, like Wrigley, took photographs of the mob outside and inside the Capitol, videotaping some violence, and had social media or texts about the riots. He also posted online before the riot that chaos was coming. He later cooperated with law enforcement and provided evidence from his device. Bennett received a sentence of 3 months of home detention, 80 hours of community service and 24 months of probation.

In *United States v. Donna Bissey*, 21-CR-165 (TSC), Bissey, like Wrigely, was in the building for a short time (about 5 minutes), posted photographs online, and proclaimed pride on social media about her presence at the riots. However, she exhibited little remorse for her actions. The Court imposed a sentence of 14 days incarceration and 60 hours of community service. A third case is comparable as well.

In *United States v. Jeremy and Jessica Bustle*, 21-CR-238 (TFH), Jeremy and Jessica Bustle were inside 20 minutes longer than Wrigley. Jeremy Bustle posted almost no social media. Jessica posted more incendiary comments. Both received sentences of 24 months of probation, with 40 hours of community service and home detention of one month and two months, respectively.

Lastly, in *United States v. Cindy Fitchett and Douglas Sweet*, 21-CR-41 (CJN), Fitchett and Sweet received sentences of three years of probation, with 30 days home detention and 60 hours of community service. They were in the Capitol, and the Capitol Visitor's Center for at least eight minutes if not more. Fitchett filmed herself before going in stating "We are storming the

Capitol. We have broken in." She saw chairs being thrown at officers inside, where she was arrested. Fitchett had observed an angry mob outside, including seeing a noose. Her codefendant, Douglas Sweet, took a picture of a rioter climbing into the window at the Senate Wing Door and later gave an interview to a local reporter. However, upon their arrest both voluntarily gave FBI an interview and gave consent to search their phones. So, like Wrigley, these two were inside a short time and saw signs that not all was well. Thus, a sentence in line with the Government's recommendation would not be disparate to other sentences being imposed for similar conduct.

**Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Andrew Wrigley to two months of home detention, a 36-month term of probation, 60 hours of community service, a $10 special assessment, and $500 in restitution. Such a sentence is sufficient but not greater than necessary and protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481 053

By:    /s/ *Mona Lee M. Furst*
MONA LEE M. FURST
Assistant United States Attorney
Federal Major Crimes
Detailee
U.S. Attorney's Office
301 N. Main, Ste 1200
Wichita, Kansas 67202
Office: 316-269-6481
Mona.Furst@usdoj.gov

## **CERTIFICATE OF SERVICE**

On this 22nd day of November, 2021, a copy of the foregoing was served on counsel of record for the defendant via the Court's Electronic Filing System.

<u>          /s/*Mona Lee M. Furst*          </u>
Mona Lee M. Furst
Assistant United States Attorney