IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 21-cr-00042-ABJ |
| ANDREW WRIGLEY | : | |

### DEFENDANT'S SENTENCING MEMORANDUM

Andrew Wrigley was a peaceful participant in the January 6 Trump rally on the Mall. Regrettably, after the rally he followed the crowd to the Capitol and stepped inside an open doorway for one minute. He engaged in no violence or aggression. He was not involved in planning for the event, nor was he part of any group that organized, instigated or engaged in the violent aspects of the day. He has never before been charged with a crime. To the contrary, he has always been a law-abiding citizen – one who assisted the Philadelphia police around the time of the riots of June 2020. He sincerely regrets his decision to step inside the Capitol on January 6 and respects the legal process that has brought him to sentencing. Mr. Wrigley intends to make amends in whatever way the Court orders, and to never pass this way again.

The Court is called upon to impose a sentence "sufficient, but not greater than necessary," to satisfy the purposes of sentencing. 18 U.S.C. §3553(a). When the statutory sentencing considerations are applied to this specific and individual case, a short sentence of probation is appropriate. Although Mr. Wrigley's offense caused no property damage, he has agreed to pay $500 in restitution toward repair of damage independently caused by others.

The government's Sentencing Memorandum omits important chronological details and paints those at the Capitol on January 6th with a single brush stroke, which is neither fair nor accurate. Mr. Wrigley was not convicted of conspiracy, nor could he have been. He was

convicted of demonstrating where he should not have been, which was four steps inside a vestibule of the Capitol.  Yet the government asks the Court to view Mr. Wrigley as though he was part of a monolithic group of aggressive rioters who intentionally and with advance planning engaged in violence and destruction – people with whom Mr. Wrigley never associated and never communicated.  What Mr. Wrigley did was wrong.  He has and will suffer consequences.  At the same time, consideration of his punishment should not be biased by the wrongs of others.

### A. Nature and Circumstances of the Offense

Mr. Wrigley travelled to Washington on January 6 with other peaceful protestors on a tour bus that left from a church parking lot near Doylestown, Pennsylvania. He did not know anyone on the bus in advance; a friend connected him to the ride.  The trip was a last-minute decision on his part, motivated by curiosity to attend a Trump rally, a desire to exercise his First Amendment right to express concern about the election results, and an itch to travel and be around people after months of COVID quarantining.  The flag he took with him was a "Bennington" flag that he had purchased a year before, thinking it appropriate in historic Philadelphia to have an historic flag to display.

The group he traveled with and the people around him during the rally on the Mall were peaceful demonstrators.  Although violent and destructive acts indisputably occurred that day, it is important to recognize that different people – and groups of people – experienced the day differently.  The photos Mr. Wrigley took of his experience contrast with the well-publicized images of destructive entry and physical violence.  Exhibit A contains photos taken by Mr. Wrigley on the tour bus, with "everyday" people who do not appear extremist or violent; at the arrival spot at Union Station, devoid of any troubling activity; at the Washington Monument,

with the crowd gathering peacefully; and around the time of the President's speech, with the crowd holding flags and taking photos – all legal and peaceful activities.[1]

Mr. Wrigley could not hear the President's speech. When it concluded he stayed with the people around him as they and others walked toward the Capitol. Again, Mr. Wrigley's photos show a peaceful crowd proceeding without aggression. (Exhibit B) The crowd became dense closer to the Capitol, but Mr. Wrigley did not see any violence and observed nothing more in the way of property damage than fabric on the inaugural scaffolding being torn as people passed.

It is important to note that the violent "charge" upon the Capitol, the breaching of metal barriers, the breaking of Senate-side windows, and the physical break-in occurred well before Mr. Wrigley and the crowd around him arrived. During the Trump impeachment trial, Rep. Plaskett presented a detailed chronology of events, marshalling evidence of the break-in and the events inside the Capitol down to the minute.[2] Based on the chronology of events presented by Rep. Plaskett, by the time Mr. Wrigley got to the Capitol building, barricades had been moved, doors had been opened, and people who were there to do egregious damage and threaten elected officials had already entered the building and engaged in actions causing the evacuation of certain elected officials. This violent activity was not observed by Mr. Wrigley.[3]

---

[1] Based on news stories before the event, Mr. Wrigley had some concern that "counter-protestors" from Antifa might attend the rally and become violent. For a time he thought about bringing a coiled piece of metal in case this happened and he needed to defend himself, but ultimately decided it best not to take such an object to the rally, and left it on the bus. He had no weapon, nor (as far as he knows) did anyone else with whom he traveled.

[2] The presentation can be viewed at https://www.c-span.org/video/?c4945077/delegate-stacey-plaskett-president-trump-orchestrated-rally-march-capitol ("Plaskett presentation").

[3] When Mr. Wrigley arrived at the West Terrace door at 2:38 p.m., one hour and 45 minutes had passed since "rioters including Proud Boys" engaged verbally with police from across metal barriers outside the Capitol and broke through the metal barriers at 12:53 p.m.. An hour and 20 minutes had passed since police radio reported at 1:19 p.m. that 50 people were "charging" up the hill on the West side of the Capitol and video showed metal barriers being attacked and metal poles being thrown at police. Almost an hour had passed since protestors had surged past Capitol police protecting the steps on the

Mr. Wrigley continued with the crowd toward the Capitol building. As Mr. Wrigley and others from the crowd from the Mall approached the Capitol, unknown people with megaphones encouraged them to continue proceeding toward the Capitol and into the building itself. It was then that Mr. Wrigley made a mistake that he sincerely regrets. Rather than separating himself from the crowd and staying a safe distance from the Capitol, he moved with others up to the building and entered an open door on the upper West Terrace.

The exterior West Terrace door opens into a narrow vestibule leading to an interior vestibule doorway, which in turn leads into the Capitol hallway. The government describes the door as having been "breached" four minutes earlier. To be accurate, the door had been opened from the inside by people walking out the door. When Mr. Wrigley arrived, the door was open. There was no sign of damage or violent break-in.

A few feet inside the outer vestibule door, two uniformed Capitol police officers stood silent, not stopping anyone from entering. Mr. Wrigley took a "selfie" photo while standing just inside the outer door (Exhibit C), then went one-third of the way into the vestibule (about four feet) before stopping prior to the point where the police were standing. He heard a fire alarm ringing, smelled a whiff of tear gas, and heard someone who was walking out say, "They don't want us in here." He got what he describes as "a bad feeling" and knew he had gone too far -- he was somewhere he should not be. Mr. Wrigley turned and left, making his way back to the tour bus.[4]

---

West side of the Capitol at 1:45 p.m. Senate-side windows had been broken and the aggression had moved inside the Capitol by 2:12 p.m.. The heroic work of the police officer who diverted aggressive, official-seeking rioters occurred around 2:15 p.m. All of this occurred before Mr. Wrigley arrived at the Capitol. *Source*: Plaskett presentation.

[4]     Surveillance video confirms that Mr. Wrigley was in the vestibule for about one minute, beginning at 2:38 p.m. The video shows Mr. Wrigley standing just inside the open doorway for about

Mr. Wrigley has a number of friends whose views lean more liberal than his, and who had made their views known on social media during the time of the election. After he returned home on January 6, he succumbed to the temptation to be provocative by posting on his Facebook page pictures of the crowd outside the Capitol and the selfie he took at the vestibule doorway, quipping that he had gone "into the capitol building" and been "tear gassed." Seeing this posting, some of his friends reported him to the FBI, one expressing shock that their "soft spoken, thoughtful, nice, kind, encouraging, mellow" friend had done something so "out of character."

**B. History and Characteristics of the Defendant**

Mr. Wrigley has always been a law-abiding citizen. He has never before been arrested or charged with a crime. He is an artist, with an artist's reflective temperament. Friends (including one who reported his Capitol entry to the FBI) describe him as kind and thoughtful. His generosity to others is reflected in the community service he has done as an adult. As a volunteer through the Center for Literacy in Philadelphia, he spent two evenings a week teaching math to immigrants and others. For several years he volunteered through Achilles International guiding blind athletes. One of the visually impaired runners he regularly guided described the experience:

---

thirty seconds taking photos – including the "selfie." It then shows him taking four or five steps further into the vestibule before pausing, turning, and exiting.

Mr. Wrigley's doorway "selfie" shows the pertinent outward-facing surveillance camera, as well as the two Capitol police officers standing just beyond the molding divider. For the entire sixty seconds Mr. Wrigley was in the vestibule, he and/or the top of the flag he was carrying is visible on the footage from the outward-facing surveillance camera, confirming that he stopped and turned around when he was directly under the camera -- approximately 4 feet inside the outer vestibule doorway and over 8 feet away from the inner vestibule door.

> As we ran sometimes multiple times per week together…we became good friends, and I can say that training runs leading up to running a marathon together definitely provide adequate time to get to know someone.
>
> During the years I have known Andrew, I have learned that he is a very intelligent, caring, generous, and empathetic person…I literally trust Andrew with my life, as we have navigated traffic, other people in our path, and other obstacles during our training runs together.  From my own experience, I know that Andrew will always make sure the disadvantaged person is cared for…and he is considerate of everyone.

Letter from M. McAvoy (Exhibit D).

In addition to being a talented painter, Mr. Wrigley is skilled in hand crafts.  At one point he learned the art of making leather shoes by hand, originally with the goal of making money by selling them.   When he realized that this work was not going to be particularly lucrative as a business, he decided instead to share his knowledge with others so that the craft could be preserved.  He created a series of instructional videos called "How to Make a Shoe by Hand" that has garnered over 2,000 views on YouTube.   He has been contacted by people across the world who have been intrigued by the craft.   In another example of how he has used his skills to give back to the community, he ran a work-working program for troubled urban youth at the Seaport Museum in Philadelphia.

Mr. Wrigley has always had respect for law enforcement.  He was living in Philadelphia in June 2020, when looters and vandals took advantage of the unrest surrounding civil protests and did significant damage to Philadelphia businesses.  Mr. Wrigley volunteered to spend two long shifts with local police and security guards, standing guard in case looters came to a grocery store in his neighborhood -- the only grocery store serving a relatively low income area of Philadelphia.  *See* Exhibit E (photos).

Mr. Wrigley's political views have differed in recent years from those of his family, but that has not caused him to be estranged from them.  They have simply agreed to disagree, and

steer clear of contentious topics.  He is independent in his political thinking; he had supported Bernie Sanders in the Presidential race until Mr. Sanders dropped out; he then chose to support Mr. Trump.  Reflecting on the events of January 6 and his error in judgment on that day, he very much understands the importance of exercising one's rights in a responsible and lawful manner, and regrets that he overstepped the bounds that day.

  Mr. Wrigley is newly married (for the first time) and is building a life with his wife – a librarian who shares and appreciates his interest in art and handiwork.  They have recently bought a house and are busy furnishing it, using their collective artistic eye to score bargains at antique markets and on-line.  Together they are taking an HVAC course of studies (heating, venting and air conditioning) at Luzerne Community College which will culminate in a certification in HVAC.  Mr. Wrigley intends to use these skills to improve in his role as a landlord, and also to supplement his income by doing repair work for others.  (His wife is taking the course to be better prepared to oversee a renovation project at her library.)

  Mr. Wrigley's commitment to self-reflection and self-improvement is also evidenced by the counseling he voluntarily undertook a few years ago in order to better understand and manage his emotions, anxieties, and intimate relationships.  He attended counseling sessions regularly for three years and felt personal progress as a result.

  A note from counsel: Mr. Wrigley has been a respectful and responsible client who has diligently endeavored to satisfy all instructions, requirements and requests from the Court, Pretrial Services, the Probation Office, the government and counsel throughout the process of this case.

### C. The Need for Deterrence

Mr. Wrigley's self-reflection and commitment to being a law-abiding citizen makes further punishment unnecessary in terms of specific deterrence. And the publicity surrounding the January 6th prosecutions has already provided a deterrent effect to the general public: the message has clearly been sent that unlawful behavior such as occurred on January 6 will not be tolerated.

Mr. Wrigley has experienced consequences of his actions in a number of ways, even before sentencing. As a result of his friends' prompt reporting of his posting, Mr. Wrigley was one of the first Capitol protestors to be charged and arrested. The media jumped on the story. His picture was featured in a prominent national news magazine, and media reports strongly implied that he had been directly involved in violence and destruction. The fallout not only impacted Mr. Wrigley but his family, who were inundated with phone calls. Although the government has reviewed Mr. Wrigley's social media and found nothing beyond the noted postings, his social media accounts were canceled, along with his Lyft and Zipcar accounts.

Living on a modest rental income, Mr. Wrigley requested at his initial appearance that a public defender be appointed to his case, but his request was denied. Undertaking the expense of private counsel has been another consequence of his wrongdoing.

Even independent of these consequences, no further deterrence is needed. As his personal history demonstrates, Mr. Wrigley respects the law and values being a positive member of the community. Committing a criminal offense was out of character for him. There is no need to deter him or protect the public from further crimes on his part.

### D. Vocational Training

Mr. Wrigley is very committed to the HVAC course previously described, and to obtaining his certification. He attends class weekly and is registered for two classes and labs next semester.

### E. The Sentences Available and the Avoidance of Sentencing Disparity

**1. A Sentence of Probation Is Available and Appropriate**

The count of conviction (Count 4) (40 U.S.C. §5104(e)(2)(G) – Parading, Demonstrating, or Picketing in a Capitol Building) is a Class B misdemeanor with a maximum term of imprisonment of 6 months. *See* 40 U.S.C. §5109(b) *and* 18 U.S.C. §3581. As a Class B misdemeanor, it is a petty offense under 18 U.S.C. §19. The Sentencing Guidelines do not apply.

A term of probation of up to five years may be imposed in lieu of imprisonment. *See* 18 U.S.C. § 3561(a) and (c). In determining whether to impose a sentence of probation and the length of the probation if imposed, the Court is instructed to consider the factors set forth in 18 U.S.C. §3553(a). *See* 18 U.S.C. § 3562(a). For all the reasons described above, a sentence of probation is sufficient, but not greater than necessary, to satisfy the purposes of sentencing in this particular case. And, for all the same reasons, the term of probation does not need to be lengthy to satisfy the sentencing purposes.

Even though the Sentencing Guidelines do not apply, their underlying goal – the avoidance of sentencing disparities – remains applicable. This is an unusual situation in that there are a number of others who have been convicted of the same offense arising from conduct occurring on the same day, making a comparison among cases more possible and more relevant than in the typical federal criminal case.

Several organizations have been collecting data on sentences imposed in cases arising from the January 6 events, including the Department of Justice, the Federal Defenders, and National Public Radio.[5]  A review of available sources along with docket information reveals approximately 40 misdemeanor cases that have been sentenced to date.  (Curiously, the sentencing chart submitted by the government provides no factual detail about the cases listed through which the Court could make an informed comparison.)

Based on a review of docket information and the sources noted above, Mr. Wrigley's one-minute intrusion into the Capitol vestibule appears to be among the shortest of all the cases sentenced.  His social media posting after the event, while regrettable, was mild and limited in comparison to many defendants' postings.   His offense was devoid of the aggressive behavior and long-formed intention evident in some cases. A comparison to other cases suggests that a relatively short sentence of probation would be appropriate in terms of equity in sentencing.

The cases that appear to involve time in the Capitol most comparable to Mr. Wrigley's include *United States v. Sean Cordon*, No. 21-cr-269 where the defendant entered the Capitol for four minutes. Sean Cordon received a short (45 day) term of probation.  Kevin Cordon, who was also in the Capitol for only four minutes but gave an international news interview after the intrusion, received twelve months' probation and a $4,000 fine.  *United States v. Kevin Cordon*, No. 21-cr-277 (The government's chart reports that he also received 100 hours of community service; if so, that condition is not reflected on the docket.)

---

[5]  *See* U.S. Att'y Office for D.C., *Capitol Breach Cases*, U.S. DEP'T OF JUSTICE (last accessed Nov. 19, 2021), https://www.justice.gov/usao-dc/capitol-breach-cases. *The Capitol siege: The cases behind the biggest criminal investigation in U.S. history*, NPR (updated Nov. 19, 2021), https://www.npr.org/2021/02/09/965472049/the-capitol-siege-the-arrested-and-their-stories#database.

Although there are undoubtedly unknown differences among cases, longer periods inside the Capitol and/or more aggressive behavior seem to have generally garnered longer probationary sentences. *See, e.g., United States v. Croy*, 21-cr-162 (defendant who entered Capitol twice for a total of 30 minutes received three years' probation); *United States v. Ehrke*, 21-cr-97 (cited by government) (defendant who was only in the Capitol one minute but was *pushed* out 15 feet inside received three years' probation).

The cases with home detention as a special condition of probation generally seem to have had additional aggravating factors. *See, e.g., United States v. Bennett*, 21-cr-227 (cited by government) (defendant convicted of disorderly conduct while wearing a Proud Boys hat received two years' probation, three months' home confinement, and 80 hours community service); *United States v. Griffin*, 21-cr-92 (defendant who created a Trump-as-shooter video game received 36 months' probation with 90 days' home confinement); *United States v. Dillon*, 21-cr-360 (defendant who planned her trip weeks in advance and was shown on video to have been fighting hard to get into the Capitol received three years' probation with two months' home detention).

Sentences of incarceration have generally reflected more extreme aggravating factors. *See, e.g., United States v. Crurzio*, 21-cr-41 (six months' incarceration for defendant with prior record who refused to leave Capitol after being ordered to do so by police); 21-cr-148 (defendant who advanced to the door of Speaker Pelosi's office sentenced to 45 days' incarceration); *United States v. Reeder*, 21-cr-166 (defendant shown on video to have grabbed and pushed a police officer to the ground received 3 months' imprisonment); *United States v. Ryan*, 21-cr-50 (defendant who traveled to Washington on a private jet and did multiple social media postings,

11

including tweeting that she would not go to jail because she had "blonde hair and white skin," sentenced to 60 days' incarceration).

### 2. Voluntary Restitution Is Applicable

Restitution may be ordered under 18 U.S.C. §3663(a)(3), which provides that "The court may also order restitution in any criminal case to the extent agreed to by the parties in a plea agreement." There was no damage caused by Mr. Wrigley's conduct, and no "victim" that would trigger the mandatory restitution provisions of 18 U.S.C. §3663A.[6] Nonetheless, he has agreed to pay restitution of $500 toward the repair of damage caused by others, and intends to bring a check in that amount to sentencing.

### CONCLUSION

For all of these reasons, a short sentence of probation, with $500 in restitution, is sufficient but not greater than necessary to satisfy the sentencing goals of 18 U.S.C. §3553(a).

Respectfully submitted,

*/s/ Ann C. Flannery*

Law Offices of Ann C. Flannery, LLC
1835 Market Street, Suite 2900
Philadelphia, PA 19103
215.636.9002
acf@annflannerylaw.com
D.C. Bar No. 391004

Dated: Nov. 23, 2021

---

[6] 18 U.S.C. §3663A ("Mandatory restitution to victims of certain crimes") does not apply because there is no "victim" of Mr. Wrigley's offense as defined in that statute, which requires "an identifiable victim or victims [who] suffered a physical injury or pecuniary loss." 18 U.S.C. §3663A(c)(1)(B). *See also* 18 U.S.C. §3663(a)(2), defining "victim" as "a person directly and proximately harmed as a result of the commission of an offense."

## CERTIFICATE OF SERVICE

I, Ann C. Flannery, counsel for defendant Andrew Wrigley, hereby certify that on this 23rd day of November, 2021, I caused a true and correct copy of the foregoing Sentencing Memorandum to be served by the Court's electronic notification system upon counsel of record:

> Mona Lee M. Furst
> Assistant U.S. Attorney
> U.S. Attorney's Office
> 1200 Epic Center, Suite 1200
> Wichita, Kansas 67202
> Mona.furst@usdoj.gov

ANN C. FLANNERY
Law Offices of Ann C. Flannery, LLC
1835 Market Street, Suite 2900
Philadelphia, PA 19103
215.636.9002
acf@annflannerylaw.com